Before we start the clock, I had a question that I want to ask of counsel just in terms of that we received something that was filed with the court indicating pursuant to 28J that the appellees, the City of San Diego, Scott Peters, Jim Madaffer, Ralph Nsoomsa, Tony Adkins, etc. It's listed for the 4th District in McGuigan v. City of San Diego. Apparently there's been some activity in this particular case and I want to know whether how this, the statement is this judgment will be both claimant issue preclusive of appellant's failure to fund the San Diego City Employees Retirement System on all the actuarially sound basis as a result of MP2 violated appellant's federal constitutional rights. So it affects the 1983 part on that and the letter I guess would be from appellees and so maybe I should, that sort of states what their position is and are you the appellant? Yes. And your name is? Christopher Nissen. Okay. What's, does this take some things off the table for this court to decide? Your Honor, in the context of this decision making, if it's not, what the McGuigan decision results in is a sliver of a pie of the underfunding issues being raised. Are you still claiming that, are you still making all the claims that you're here today? Yes, we are. Are the appellees going to say that it's, obviously there's another case that's listed in here as being claimant issue preclusive, but are you? That's correct Your Honor. Peter Benzian on behalf of the appellees, or the servant of the appellees. The McGuigan decision that we lodged with the court is not yet final, and so. Which it would have to be final. There's an appeal provision, 30 days. When does that run? When would it be final? November 28th, Your Honor, around that date. So if we thought that it was claimant issue preclusive, that it would have to be after that date. That's right, Your Honor. Alright, well I guess, I'm assuming that the parties will notify us if it becomes a final decision, and we'll just go ahead and proceed today and argue it at this point. Good morning, Your Honor. Please support Christopher Nissen on behalf of the appellees. Can you speak up a little? I'm sorry. We are prepared to submit on the briefs at this time, but we reserve the opportunity to respond to comments from appellees. Alright, let me just ask any of the panel members if they want to ask questions now, or just want to wait. Okay, so you'll just retain your time. It's a bit unusual, but that's fine. Go ahead. You can reserve all of your time for rebuttal. Good morning, Your Honor. Peter Benzian on behalf of the appellees, City of San Diego, and the individual appellees. May it please the Court. Good morning. I'd like to start, Your Honors, with some discussion of what I think is the most interesting issue in the case, and that's the alleged claim that there was a contract impairment or a taking with respect to so-called MP2. I think that's the most interesting issue in part because of the relative dearth of federal authority that discusses particular factual situations such as we have here, and the relatively extensive state case law that goes sometimes in different directions. Well, let me ask you this. Basically, it seems to be not disputed that appellants have remedies in state court relative to these pension plans and retirements and all of those type of things. In fact, we know that that's been going on because there's the Gleason case, and now, do we pronounce it McGuigan? McGuigan, Your Honor. McGuigan. All right. And so we know there's access to the courts, and in fact, there have been resolutions on both of those cases, albeit that one's not final. So essentially what appellants are asking, they want to be in federal court as well, and they have to basically show a constitutional violation to do that, to have access in federal court. And I don't think that there, you know, there isn't anything out there, whereas in many 1983 cases, we clearly, there has been, there's some established law on that. And here, there isn't another, there isn't a case out there that says, okay, this amounts to a constitutional violation. So it, they're asking us to go where no one's gone before. So why don't you tell me why that would be, why we shouldn't, and why that would be a terrible thing to do? Well, Your Honor, we started out in the case back in 2005, moving to dismiss on various grounds and asking the federal court to abstain for the very reason that we believed the issues sought to be raised by the POA were more properly litigated in state court, and that their attempts to assert 1983 claims didn't have either a legal or a factual basis, and that accordingly, the court ought to abstain. The court... Well, it seems like it worked. Well, ultimately... That doesn't mean that you belong in federal court, but it seems like it worked. Yes, Your Honor, although we had to spend three years litigating with the POA in federal court, and I think Judge Huff, the district court, was concerned about reaching and addressing the federal constitutional claims. We think she did so completely appropriately based on the facts and the applicable law, and the absence of any federal authority for the proposition that a municipal government must maintain a fully funded, actuarially-paced retirement system. No, wait a minute. That's your position, fully funded. They never took that position. They talked about something being actuarially sound, and that's very different, is it not, from fully funded, right? I would agree, Your Honor, that there... You kept arguing that in your brief, and I couldn't... In candor, I had difficulty understanding that because I've never seen any case that has talked in those terms, but rather the question, what do you mean by actuarially sound? You talked about actuarially sound as though what it meant was, if you can meet your current obligations, then don't worry about anything else. That's not what actuaries do, is it? No, Your Honor. They attempt to project or calculate the accrued, present value of the accrued liabilities and determine funding that will ultimately satisfy those liabilities. But that's different from being fully funded. Well... Fully funded means that you've got money in the bank that, when put at interest, is going to be meeting the obligations as they accrue, and that's not what the actuaries do. Actuaries make some assumptions in those terms, and you don't have to have the money actually in the bank. It would be terrible, would it not, for a municipality to be facing that kind of obligation, you know, a billion dollars worth. Well, Your Honor, there is this concept of a so-called unfunded actuarially accrued liabilities, and there's no dispute that there was what is referred to as an unfunded ratio in the San Diego retirement system. And that ratio currently, based on the latest actuarial report, the unfunded or the ratio is approximately 82 percent. That is, the present value of the assets in the San Diego retirement system satisfy 80 percent of all of the projected accrued liabilities of the future anticipated liabilities for additional employees. But the California case law, Wilson, for example, talks about there being a contractual right to an actuarially sound system, right? Yes, Your Honor. But with respect, I think Wilson, first of all, is a court of opinion. Well, of course, in the remote precincts from which I emanate, the Intermediate Appellate Court is viewed as a reasonable predictor of what the Supreme Court is likely to do. I don't know how it is out here. Maybe not. Well, there is an interesting thread in all of these California cases. The Wilson v. Board of Administration case and several others adopt similar language in dictum, such as Wilson did. There are other court of appeal cases that go the other way. Bant, for example, the most recent court of appeal case that was decided in 2006, discusses in great detail the concept of actuarially sound and points out that one needn't have a pension system that is, quote, fully funded, but rather a funded ratio of somewhere in the 80 or 70 percent is What would they need to show, in your view, to make it constitutional? What would they need to show? To make it unconstitutional? No, no, no. To be able to satisfy federal jurisdiction on 1983. What would they need to show in terms of that you have a constitutional right to have an actuarially funded? They would have to demonstrate that there is an unmistakable provision in the legislation or the ordinance, or in our case, the charter, requiring the city to obtain an actuarially sound retirement system, and then demonstrate that that right is a contractual right, and then demonstrate that that right has been impaired. Isn't it rather that what the California courts have said about that requirement, rather than saying, well, we have to be able to point to this in the legislation, if California courts have said, no, we find that there is this kind of obligation, isn't that really the standard? We're talking about the contracts clause in the first instance, and the contracts clause is essentially dependent in substantial part on what state law provides, is it not? In part, Your Honor, but Keating and the applicable U.S. Supreme Court authority, U.S. Trust, and more recently the Ninth Circuit in the Robertson case, make it very clear that it's a question of federal law as to whether or not there is a contractual right, and then whether or not that's been impaired. Yeah, but Keating also talks about the actuarial soundness of the system, and of state law. That is, the federal test depends upon what, when we talk about contracts, we're talking about the creature of state law, aren't we? Yes, Your Honor. And therefore, state law defines the contract, and then the federal Constitution comes along and says that can't be unreasonably impaired. But importantly, Your Honor, the contracts, the contract issue differs depending on what legislation or ordinance you're looking at, and in the cases that Your Honor refers to, the Wilson case and the Keating case, the court was looking at quite different, I would submit, legislative provisions. For example, in the Wilson case, the court was interpreting the language of the state legislation that adopted the public employee's retirement system, and that's a very different system, and a much more extensive and explicit system with regard to actuarial soundness. Then the charter that we're dealing with in this case, the San Diego City Charter, which... So we try to make a prediction about what the state court is going to do with a property question, because that then becomes a federal question, right? Yes. Yeah, right? Yeah. Can I ask you to backtrack for just a moment? Sure. Because as I read the decision relating to the McGuigan appeal, it sounds like all of this issue has been settled and released. And so my question is, when you say it's not final yet, what's left? Is it just a petition for review to the California Supreme Court, or is there something else left? No, that's all that's left, Your Honor. The time to elapse within which a petition for hearing can be filed. No such petition has been filed, so far as I know. And so if the state Supreme Court doesn't either, it's not filed, or the state Supreme Court doesn't grant it, then it seemed to me that the contracts clause issue, at least asked to the city, was settled, and that was specifically covered by the release. Is that correct? That's the city's position. I think the POA disputes that and argues that certain reservations in the government preserved their claims. It says right on page 51 that they released under section 1983, the federal and common law to the extent that they're based upon the city's failure to pay the amount annually determined by the SDCERS actuary and approved by the SDCERS board from 1996 to 2006, and any damages recovered under three little limited to amounts in excess of this special additional. So it looks like the contract and the takings were settled. We agree, Your Honor, with respect to the claim of actuarial unsoundness or the MP2 issue. We would acknowledge that the McGuigan case doesn't address, nor does the McGuigan case with respect to the 2005 negotiations. Before we get to 2005, looking at MP2, how about the conspiracy claim that the San Diego SERS conspired with the city? Is that claim still alive? And if so, what is it? We believe it's not still alive under either Gleason or ultimately McGuigan, and under the district judge's conclusions that there was no constitutional impairment under the contracts clause or a taking, that if you don't have that constitutional underpinning, a conspiracy claim disappears. But what do you mean by the in the settlement? Because the settlement agreement is not part of our record. That's right, Your Honor. I mean, presumably we could take judicial notice of it, but we don't have it. So was conspiracy, is it your position that the conspiracy claim was also part of the settlement, at least, or not? No, but I think the conspiracy claim disappears if there is no underlined constitutional claim. You're saying it's issue preclusive, even though it might not be claim preclusive. That's right. What was the party in McGuigan? Was that a class? And what did that consist of? Yes, it was a class consisting of basically all current employees of the city of San Diego, including members of the POA. Okay. I mean, I think you have a problem with Gleason privity, but you might not have the same problem with this. Well, I think McGuigan, I don't agree, Your Honor, completely. I would argue that you'll say that McGuigan's got better privity. Better privity. Well, let me then ask you about the 2005, and that's the last best final offer. And you're relying on Fontana, I guess, to say that there's no contract, that these are terms of employment. What do we do about Cal League, I guess is the other, California League of Cities? Well, I'm just, as I recall, Your Honor, the city of Fontana case, which is a 1998 decision, concludes, we think correctly, that the retiree health benefits issue is a sort of a longevity issue and has never been considered to be a pension benefit. And it's equivalent to the longevity terms that were discussed in Fontana and where the Fontana court concluded that they didn't raise impairment issues because they were terms of employment that were typically negotiated. And there's the Palos Verdes Library District case that was earlier decided, I think 15 years or so before city of Fontana, which the POA asserts is authority for their position with respect to retiree health benefits. The city of Fontana case, I think, appropriately and extensively discredited the analysis in the Palos Verdes Library case. And I think that applies as well to the California League of Cities case. I'm trying to recall the facts of that particular case. The bottom line, though, Your Honor, is we submit that the undisputed evidence to the district court was that retiree health benefits had never been considered to be a pension benefit. Rather, they are negotiated, and the MOU provisions into which the POA and the city entered into periodically, I think, confirm that. And therefore, the modest tinkering by the city with respect to the eligibility for retiree health benefits, which basically only required an additional, I think, five years of service for an employee to be entitled fully to retiree health benefits when he or she retired, that under those circumstances, that is not, it doesn't implicate either the contracts clause or the takings clause under the Fifth Amendment. And that's true as well with respect to the 3.2% pickup issue and to the reduction of drop participant salaries, which were the three issues that POA points to as constituting a basis for their impairment of contract and taking claims. All of those items are basically wage-related. With respect to the reduction in drop participant salaries, the POA argues, well, since these people were participating in drop, in effect, their salaries become, in effect, a pension benefit. But that's belied by the very name of the program. It's Deferred Retirement Program. And under the election that these employees sign, they explicitly acknowledge that they're not retiring, that they're going to continue to be active employees of the city. The only thing that happens when they elect to participate in drop is that their pension calculations are fixed at that point in time. But they continue to be an active employee and subject to wage increases or wage decreases. And so the reduction in the drop salary we submit doesn't raise any contract impairment or taking claims. And the same is true, we submit, with respect to the 3.2% reduction in the city's subsidies of the employee's contribution. You're out of time, but I and other panel members may have, but I want to spend just a little bit of time with you on the attorney's fees part of it. Now, you claim basically that you didn't get to make the motion. And I'm going to ask the other side about this. But I think there's a little bit of transparency about what I ‑‑ you may have a right to ask for, you know, to at least ask for it. And maybe the court didn't give the best reasons. But the transparency seems to be, even though, you know, you're claiming that you won everything, they still seem to want to claim that they won, even though they didn't win on anything there. And I would call ‑‑ it seems to me that the court spent a lot of time with both of you and that the court was looking at this, what I would call the usual suspects, that these two sides are frequently in court all the time and everyone's always claiming that they won, even though whatever. And the courts, obviously they came to, you know, the court didn't feel that the appellants had a right to be in federal court on this. But it seems that on some level they're certainly going to claim at this point taking you to federal court made you settle all of these other ones and that's how they're going to say that using that as a bargaining that they won. And it seems like the court just said, okay, I'm going to tell you whether you have a right to be in federal court or not. But the court was also looking at you and saying, you know, why didn't you just take care of business in state court and not bother me? And so I'm not going to give either, you know, they don't get attorney's fees because they didn't win anything. You don't get it because they don't. You couldn't meet the 1998 requirement. Right. Right. 1988. Pardon me? You said 1998. You meant 1988. 1988. I'm sorry. Thank you, Your Honor. But we can't really see from this record that, I mean, you know, I'm looking sort of, I think that's what the court was saying, but I can't really see it on this record. So maybe. What stopped you from moving under 54D2 after? You said it would have been futile. Yes, Your Honor. I've known district judges to reconsider matters when they're fully presented and you certainly had time to do that and didn't. That's correct, Your Honor. And I can't say anything more about that other than what we've said in the brief to try to excuse our failure to do that. That maybe you didn't deserve attorney's fees? Kristen for Garment said no, right. All right. Thank you for your argument. Thank you, Your Honor. Thank you, Your Honors. Excuse me. I guess I'll focus the bulk of my comments on the McGuigan matter and the scope of the release. Well, yeah. I mean, if you look at page 51, it certainly seems like you released those. You know, I think that your arguments about the Gleason previty had some value, but I don't see the previty argument as saving you on McGuigan. And it looks like on page 51 that you released those claims. A couple of issues in that regard. We have other things to do if you released it somewhere else. Certainly, Your Honor. We vigorously dispute the fact that it's a complete preclusion of our claims, and here is the basis for that. Well, I think some are left, but I don't think on the 1983 part of it, on the takings and the contract part of it, I don't see what – it looks exactly like you mentioned 1983 right there. Your Honor, the portion of the claim that is released in McGuigan assumes for purposes of that release the legality of the manner in which the city agreed with CSRS to fund their obligation, and that is colloquially known here as MP2. The issue resolved in McGuigan was whether or not, assuming the legality of MP2, they did in fact fund at the level that they had agreed to in that agreement. That was not the case. So what they failed to do was fund the complete required contribution that they had deemed proper under this MP2 agreement, and that's where you'll see a term in the McGuigan settlement called the shortfall on the employee annual retired contribution. That issue is resolved from that case. We agree with that. However, what is left unaddressed entirely in that case, and there's a lengthy record of oral argument in front of Judge Strauss, the state court judge, what is left is whether or not, and I think Your Honor had hit on this point earlier, whether or not it was legal initially for CSRS and the city to avoid actuarially sound principles for determining what their employee required contribution would be. Well, you want, you know, the thing is if you released it, but you want to still have an opportunity to say that you've got access to federal court. You want us to create, you know, federal jurisdiction for you on this. And why isn't, to me, I see that that's an advisory opinion, and that would be a nice arrow in your quiver, but if it's not before us, we don't give advisory opinions. Well, Your Honor, and that is a good point to be made. There is no record of the McGuigan briefs, McGuigan arguments, none of the transcripts are before this court, and so what you have is a limited record to address. But if you read the detailed 50-plus page opinion, the court repeatedly references that Judge Strauss was seeking to avoid any unintended consequences with respect to limiting that release, and that he was not looking to release our federal claims. He was very aware of the federal lawsuit we had pending, and both the takings and contracts issues that were at issue in that case. Well, what does that mean on page 51 then? That language on 51, that release language, what does that mean? I actually don't have the language directly in front of me. If you want to approach, I'll let you borrow mine. Thank you, Your Honor. You can take it back and then return it right there. Okay. I think the key to this, and it's actually addressed in italics, is the qualifying language after 42 U.S.C. 1983 in this release provision that states specifically, the release addresses the 1983 claims only to the extent that they are based on the city's failure to pay the amount annually determined by the CSRS actuary and approved by the board in the 96 through 2006 agreements. Now, that reference is to the MP1 and the MP2 agreements. Both of those agreements were designed to allow the city and CSRS to avoid the required contributions that they needed to make in order to create an actuarially sound pension system. So to the extent they failed to fully fund, I'm sorry, that's a bad use of that term. To the extent they failed to actuarially fund their system, all that was dealt with in McGuigan was the thin sliver of what that shortfall would have been, leaving and setting aside the issue of whether or not we had a right under state law to an actuarially sound pension system and whether or not that right was impaired by the contractual imposition of the LBFO in 2005. Would you, all right, so you're saying you didn't release those in that, and we'll obviously look at that. Is there privity? Your Honor, I have made that argument a few times, that there is no privity in this case, and a couple of factors that I think suggest that are the following. In McGuigan? In McGuigan. I thought you were included in that. It was no opt-out class. It specifically included the LBFO. Let me back up into some of the procedural history and might clarify. We objected throughout the proceedings to that class certification for settlement purposes. We, in fact, filed a motion to intervene in the court in the case, and the court denied that motion. On the grounds that you were already part of the class then? Actually, no, on the grounds that we had filed a reservation of rights and we were objecting to the jurisdiction over our case. Other issues that come up that really defeat issues of privity are, for example, William McGuigan is not a representative plaintiff. He cannot represent these individuals. He was a member of an earlier class that was a settled class. Part of the terms of McGuigan, in fact, require the attorney from that case to go back to the Gleason matter. Was he a retired person? Excuse me? Was he a retired person? He is retired, yes. But didn't you make those arguments to the state, the appellate court, and the appellate court rejected them? I mean, that was how I read this opinion. Yes, we did. Okay. You think you deserve attorney's fees, too? Your Honor, I think that to the extent the prevailing party argument was addressed, it was simply to demonstrate to the court that actions were taken by the city to start rectifying and remedying the vast underfunding that had been going on. What do you do with the Supreme Court's disavowal of the idea of the catalyst theory as a predicate for awards under 1988? The Supreme Court has said no way that you have to show a judgment in your favor or something essentially equivalent, right? Certainly, Your Honor. And your argument is essentially that you were the catalyst for getting some benefits. That's correct, Your Honor. You're right. And aren't you out of luck under the Supreme Court decision? Well, I think there's really nothing more that we could argue in support of that. Am I sort of correct in my usual suspect argument of what the court thought? I think Your Honor is very attuned to the situation. Okay. I have another question. The district court didn't grant summary judgment on the statute of limitations issue, but I couldn't see any basis either in what the district court held or in your briefing as to why the statute of limitations hadn't run on the contract clause claim to the extent that that's a lie posed by McGuigan. The district court mentions continuous violation, fraudulent concealment, but given that the contract clause violation would occur at the time that MP2, I guess it is, that the MP2 was issued because the contract clause says it has to be legislation, what theory is it that the statute of limitations hasn't run on those claims? Well, initially there is a four-year statute on the contract action. I'm sorry, I didn't hear that. There's a four-year statute on the written contract, and the MP2 provision was put into place November 18, 2002. The filing of the lawsuit was within four years of that. Additionally, that contractual arrangement creates an ongoing commitment on an annual basis for the city to make payments under that contract. So for 1983, we normally look to a two-year statute of limitations in California. Are you saying there's some reason that the two-year statute of limitations for 1983 action is not applicable? One of the issues that arises is if you look historically at the case, in 2002, the decision was made to implement this MP2 issue, and there were concerns raised at that time about the future potential damage that that could create. None of that actually occurred in the end of 2002 and through 2003 and 2004. There was a substantial delay in the release of auditing reports during that time period that would have been able to verify that.  And that is that the operative fact is when the thing took place and not when the damages are sustained. Well, actually, the damages, the act of implementing it was one act. However, the utilization of it to impact and impair the contracts and takings occurred later on as a pretext to the 2005 negotiations. In fact, MP2 created a predicate situation where the city could then in turn go to the unions and say, we do not have the money, we cannot negotiate any new additions to any benefits, and all we are here to discuss is takeaways. So I'm looking at the case that I think Judge Shader was citing, and he's saying that in this case it was a discrimination action, but it says that the statute of limitations starts running upon the time of the discriminatory acts, not upon the time at which the consequences of the acts become most painful. In that context, the discriminatory acts would have occurred in and around the spring of 2005 during the negotiations. The violation, as I understand it, is the impairment of the contract or the right to the actuary liaison pension, and that would have happened when the legislation was enacted. That's why I'm having trouble with the statute of limitations issue. Well, in and of itself, there's also the annualized re-up of that obligation. Every time they make that annual required contribution based on that unlawful premise, they're making essentially an installment contract payment into the system. So minimally, at the very least, you can go back through those two-year periods where they were actually making those payments, and that continued unlawful activity is there during that time period. So your theory is that the annual payments were, in effect, additional legislation impairing the contract right of the employees. Is that the theory for the statute of limitations? Right, and in addition, there is an annualized need for the city to pass salary ordinances to enact any of the changes that make to the benefits. We don't appear to have any additional questions. If you don't have any additional comments, you're not forced to use all of your time. I do not. Thank you. Yes, please approach. Thank you. All right, this matter will then stand submitted. Thank you both for your arguments.
judges: Callahan, Ikuta, Shadur